1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3  GOOGLE, INC.,                    )
                                    )  Case No. CV-09-642-HU
4          Plaintiff,               )
                                    )
5  v.                               )  October 21, 2009
                                    )
6  TRAFFIC INFORMATION, LLC,        )
                                    )
7          Defendant.               )
   ─────────────────────────────────)  Portland, Oregon

8

9              TRANSCRIPT OF PROCEEDINGS

10                 (Oral Argument)

11

12    BEFORE THE HONORABLE DENNIS J. HUBEL, MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22  COURT REPORTER:        AMANDA M. LeGORE, RDR, CRR, FCRR, CE
                           U.S. COURTHOUSE
23                         1000 SW Third Avenue, Suite 301
                           Portland, OR  97204
24                         (503)326-8184

25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:          JULIA MARKLEY
                                 Perkins Coie, LLP
 3                               1120 NW Couch Street
                                 10th Floor
 4                               Portland, OR  97204
                                 (503)727-2004
 5

 6
                                 THOMAS SHUNK
 7                               Baker and Hostetler, LLP
                                 3200 National City Center
 8                               1900 East Ninth Street
                                 Cleveland, OH  44114-3485
 9                               (216)861-7592

10

11   FOR THE DEFENDANT:          TIMOTHY DeJONG
                                 Stoll, Stoll, Berne, et al.,
12                               209 SW Oak Street, Fifth Floor
                                 Portland, OR  97204
13                               (503)227-1600

14

15                               C. DALE QUISENBERRY
                                 Polasek, Quisenberry & Errington, LLP
16                               6750 West Loop South, Suite 920
                                 Bellaire, TX  77401
17                               (832)778-6000

18

19   ALSO PRESENT:               CHESTER DAY

20

21

22

23

24

25
```

3

```
 1              (Wednesday, October 21, 2009; 10:00 a.m.)

 2

 3                         P R O C E E D I N G S

 4

 5              THE CLERK:  Your Honor, this is the time set for Case

 6    No. CV-09-642, Google, Inc., versus Traffic Information, LLC.

 7              Time set for oral argument on defendant's Motion to

 8    Dismiss for Lack of Subject Matter Jurisdiction and Alternative

 9    Motion to Change or Transfer Venue.

10              Counsel, beginning with plaintiff's counsel, please

11    identify yourselves for the record.

12              MS. MARKLEY:  Julia Markley of Perkins Coie law firm,

13    counsel for Google.

14              MR. SHUNK:  Tom Shunk, from Baker and Hostetler.

15    We're also counsel for Google.  And with us is a client

16    representative, Mr. Chester Day, associate litigation counsel

17    with Google.

18              THE COURT:  Thank you.

19              MR. QUISENBERRY:  Dale Quisenberry with Polasek,

20    Quisenberry & Errington for the Defendant Traffic Information.

21              MR. DeJONG:  And Tim DeJong with Stoll Berne, also for

22    the defendant.

23              THE COURT:  Good morning to all of you.

24              I've had a chance to review the filings on these

25    motions.  And I'm ready to hear argument -- ready to hear
```

1    argument.  I'll hear from the moving party first.

2           MR. QUISENBERRY:  Your Honor, can I just make my

3    argument --

4           THE COURT:  You can stand there, or can you stand at

5    the podium, wherever -- wherever you're comfortable.

6           MR. QUISENBERRY:  I'll stand.

7           If it pleases the Court -- can you hear me?

8           THE COURT:  I can.

9           MR. QUISENBERRY:  I'll start with a brief summary of

10   some of the facts, move to the Motion to Dismiss, and then move

11   to the Motion to Transfer.

12          THE COURT:  Okay.

13          MR. QUISENBERRY:  So I represent Traffic Information,

14   LLC.  I'll refer to them just generally as Traffic.  Traffic is

15   a limited liability company, set up under the laws of the state

16   of Texas.

17          Its primary assets are the patents in suit here, the

18   '862 and the '606.  They're part of a broader family that

19   includes at least one other patent.

20          These patents are generally directed to the systems

21   for delivering traffic information to a mobile user device,

22   such as a telephone or a navigation screen in a car, or what

23   they refer to as PNDs, or personal navigation devices.  An

24   example of that would be one of these handheld devices that you

25   see people plugging into their -- moving from car to car, like

1    a Garmin or a TomTom.

2          So Traffic's only assets are these patents, and its

3    business is focus on monetizing these patents.

4          It has done that through enforcement of the patents,

5    through patent infringement lawsuits; all of which have been

6    filed in the Eastern District of Texas, the Marshall Division.

7          Now, since 2007, Traffic has filed six lawsuits

8    against numerous defendants.  All of these have been filed in

9    the Eastern District of Texas.

10         The first three of these cases have now been resolved,

11   and they're dismissed.  The last three are -- remain pending.

12   And one of those is of particular relevance to this action.

13   It's the one that we've referred to in the papers as the

14   T-Mobile action.  And I'll get that -- get to that in a little

15   more detail here in a minute.

16         So when we got word that Google had filed this

17   lawsuit --

18         THE COURT:  Am I correct that of the six actions in

19   the Eastern District of Texas, five were filed after this

20   lawsuit was filed here, and one was filed before?

21         MR. QUISENBERRY:  No, sir.  Three of them were filed

22   before and three of them were filed after.

23         THE COURT:  Okay.  And were the three --

24         MR. QUISENBERRY:  I believe that's correct.

25         THE COURT:  The three that were resolved were filed

6

1    when?

2              MR. QUISENBERRY:  The first one was filed in 2007.

3              I can get the exact dates for you.

4              THE COURT:  I'm just curious if it's the three

5    resolved cases that were filed before this one or if it's two

6    of those and -- and the T-Mobile.

7              MR. QUISENBERRY:  One of the cases that is still

8    pending was filed before this Google action.

9              THE COURT:  And that's the T-Mobile?

10             MR. QUISENBERRY:  Yes.  The other two were filed

11   after.

12             THE COURT:  Okay.  Go ahead.

13             MR. QUISENBERRY:  Okay.  So when we first heard about

14   this lawsuit, we were kind of wondering what the basis for it

15   was, because Traffic had not had any threats made to Google

16   about its patents.  And in the complaint, paragraph 9, Google

17   admits this.

18             So as you read through the complaint, it becomes clear

19   that the basis for this case was alleged threats that were made

20   by Traffic to T-Mobile, in connection with the T-Mobile case

21   down in Texas.

22             For example, if you look at paragraph 3 of the

23   complaint, they recite the jurisdiction as based upon grounds

24   that Google seeks a declaration of its rights against threats

25   of patent infringement litigation made by Traffic concerning

1    one of Google's products, Google Maps, directly to T-Mobile USA

2    Inc., a customer of Google -- Google in connection with the

3    T-Mobile case, and they provide the style and the case number.

4        If you go down to paragraph 15, it says, Traffic has

5    alleged and continues to allege that Google Maps uses

6    technology covered by the Traffic patents.  Traffic has

7    asserted these allegations in litigation with T-Mobile.

8        So we read those allegations, and we wondered what

9    threats are they talking about?  Because there hadn't been any

10   direct threats from Traffic to Google.  And if you look at the

11   complaint that Traffic filed against T-Mobile and the other

12   defendants in the T-Mobile case, there's no mention in there of

13   Google.  No mention of Google Maps.  There's no, you know,

14   identification of any specific product.

15       So there was nothing of public record that Google

16   could have been relying on to form its apprehension of suit

17   that gave rise to this lawsuit.  So --

18       THE COURT:  Is there anything else that T-Mobile

19   allegedly uses, other than Google Maps, to transfer Traffic

20   Information to its mobile devices?

21       MR. QUISENBERRY:  Your Honor, I have the answer.  If

22   it's important, I can get it to you.

23       I guess the concern I have is -- is the concern I had

24   that got us here in the first place, which is a public charge

25   of infringement.  So if I answer your question and identify

1    that there's -- I guess I could say, yes, there are others,

2    without identifying them.

3            Does that answer your question?

4            THE COURT:  It does.

5            MR. QUISENBERRY:  Okay.  So we -- we were wondering

6    what threats are they talking about.  So upon a closer read of

7    the -- of the complaint, and specifically in paragraph 8, it

8    says, Upon information and belief, Traffic notified T-Mobile

9    that the, quote, traffic feature, close quote, of Google Maps

10   allegedly infringes the Traffic patents.

11           And so then the question -- you know, there's this

12   curious use of quotes around the phrase "traffic feature."  And

13   so we began to look into that and investigate it.  And went

14   back and looked at our confidential correspondence with

15   T-Mobile, in connection with the T-Mobile case in Texas, and

16   discovered that there was a confidential e-mail that was sent

17   by Traffic's counsel in reference to Google Maps, and a

18   confidential e-mail to T-Mobile's counsel.  And we've provided

19   some of the details of that e-mail.  I think, first and

20   foremost, is that it was clearly marked "confidential."  There

21   was no consent on the part of Traffic to the disclosure by

22   T-Mobile of this confidential e-mail.  There -- Traffic's

23   understanding and expectation is that it would be kept

24   confidential.  And T-Mobile never advised Traffic that T-Mobile

25   was not going to honor that confidentiality.

9

 1          But I think it's clear, it's undisputable that -- that

 2    the source of Google's allegation in paragraph 8 regarding the,

 3    quote, traffic feature, close quote, is the confidential

 4    e-mail.  And we have made that assertion of record in our

 5    evidence.

 6          Google has stood by silently and hasn't said anything

 7    about it.  They haven't disputed it.  They haven't said, No, we

 8    didn't receive a copy of the e-mail.  So I think it's safe to

 9    assume that the e-mail was given to Google.

10          And I think what that boils down to is -- is this

11    question.  Whether or not it's proper for a declaratory

12    judgment patent case to be based on an improperly disclosed

13    confidential communication that took place between the patent

14    owner and a third party, here Traffic and T-Mobile; that the

15    third party, T-Mobile, then turns around and improperly

16    discloses to the declaratory plaintiff, here Google.  That's

17    the question.  And it's our position that -- that the answer is

18    no, that's not proper.

19          I think that there are a couple of reasons that

20    that -- that support that conclusion.

21          First is the -- the SanDisk case.  And in Footnote 1

22    of the SanDisk case, the Federal Circuit clearly indicates that

23    the risk of a declaratory judgment action can be avoided

24    through the use of a confidentiality agreement.

25          Now, Google has cited the SanDisk case for the

 1   proposition that if -- if you're just relying on Rule of

 2   Evidence 408, then those communications are fair game and they

 3   can be used to support declaratory jurisdiction.

 4        We agree with that.

 5        THE COURT:  Was there a confidentiality agreement, or

 6   was there a request for confidentiality that wasn't honored?

 7        MR. QUISENBERRY:  There was -- there was not an

 8   express written confidentiality agreement.

 9        We -- it's our position that there was an implied

10   agreement that was created through the course of conduct and

11   the designation on the e-mail as being confidential.

12        THE COURT:  So unless T-Mobile alerted -- I gather

13   your view is unless T-Mobile alerted your client that -- or its

14   counsel that it wasn't going to honor the designation of

15   confidential, there was an implied agreement for

16   confidentiality.  Is that a fair summary of --

17        MR. QUISENBERRY:  Well, I think that's one point.  I

18   don't know if it's critical whether or not T-Mobile gave any

19   indication one way or the other.  I think it's clear that

20   T-Mobile just ignored it, and we think that's improper.

21        We think it's improper when you're having confidential

22   communications and you clearly label the document as

23   confidential, for the other party to turn around and share it

24   with someone else.  I think that's really what this case boils

25   down to.  Is that acceptable behavior, or no?  And we don't

1 think it is.

2     I was just going to say -- I guess a couple other

3 things on this -- on the -- the Federal Rule of Evidence 408

4 point.  As I mentioned, Google attempted to basically spin that

5 back on us and try to say, well, you're relying on Federal Rule

6 of Evidence 408.  SanDisk says that doesn't fly, therefore you

7 lose.

8     And the point I want to make clear to the Court is

9 we're not relying on Federal Rule of Evidence 408 as the basis

10 for the Motion to Dismiss; rather, we're relying solely on the

11 designation of the e-mail as being confidential.

12     A couple of other points on Google's response.  I

13 think that they mischaracterize what the confidential

14 information is.  Google's view of the world is that the

15 confidential information is the phrase, "traffic feature."  And

16 then they say, well, we use that phrase all the time, and

17 therefore that's not confidential and so there's no harm.

18     I think that argument misses the point.  The point is

19 that the entire e-mail that included the phrase "traffic

20 feature," is the confidential information.  It's not just the

21 phrase "traffic feature."  It's the entire e-mail.

22     And then -- so we have SanDisk and what they say in

23 that case about confidentiality as being a way to avoid the

24 risk of a DJ.

25     And then another way that the courts look at the --

1    the determination -- the -- the, quote, case or controversy

2    determination is to view it from the standpoint of the

3    constitutional doctrine of standing.

4         And one of the elements of -- of standing is -- is to

5    show that the injury is, quote, Fairly traceable to the

6    defendant's conduct.

7         And we believe this goes hand-in-hand with -- with the

8    rationale that the Federal Circuit was laying down in Footnote

9    1 of the SanDisk case in that it's not -- you know, under no

10   standard of fairness can -- can anyone say that it was fair for

11   T-Mobile to improperly take that e-mail that had clearly been

12   marked "confidential," and turn it over to Google.  And then

13   for Google to turn around and file a lawsuit based solely on

14   that e-mail.  That's -- that's fundamentally unfair.

15        And I guess for those two reasons, we think the case

16   should be dismissed.  And it should not have been brought, and

17   it needs to be dismissed.

18        THE COURT:  Okay.

19        MR. QUISENBERRY:  Okay.  Let me move on to the Motion

20   to Transfer.  And we obviously believe the case ought to be

21   transferred to the United States District Court for the Eastern

22   District of Texas, Marshall Division, where the other three

23   lawsuits are pending.

24        We believe that the interests of justice prong of

25   Section 1404(a) compels this, and this is especially the case

1  because of the -- the strong connection between this -- this

2  case and the T-Mobile case.

3       And we -- I just walked through some of the

4  allegations of the complaint.  It's -- it's just undeniable

5  that the T-Mobile case is directly related to this case and

6  gave rise to this case.

7       I talked about paragraph 3 of the complaint.

8  Paragraph 7 and paragraph 8, all of these, it's clear -- let me

9  just look at paragraph 15.

10      Where it says, Traffic has alleged and continues to

11  allege that Google Maps uses technology covered by the Traffic

12  patents.  Traffic has asserted these allegations in litigation

13  with T-Mobile.  Google has an objectively reasonable

14  apprehension that Traffic will bring a patent infringement

15  action asserting the Traffic patents against Google concerning

16  the Google Maps traffic feature.

17      So it -- it's just so clear that this case directly

18  arose out of communications that took place in connection with

19  the T-Mobile case in Texas.  I find it hard to understand how

20  Google, in its brief, can say that the Eastern District of

21  Texas has no, quote, unique connection to this case.

22      I mean, I don't see how it could be more unique.  This

23  case is directly linked to the T-Mobile case and directly arose

24  from those alleged statements that were made there.  It's also

25  undeniable that there are identical issues between this case

1    and the T-Mobile case.  Identical issues of claim construction,

2    identical issues of invalidity.  And I don't see how there

3    cannot be identical issues of infringement, as well.

4          If you look at the answer and counterclaims that

5    T-Mobile filed in the Texas case, they have counterclaims for

6    invalidity, counterclaims for noninfringement.  Just like --

7    they're mirror images, or identical for the claims for

8    declaratory relief that Google has filed in this action.

9          THE COURT:  When is claims construction going to take

10   place in the T-Mobile lawsuit?

11         MR. QUISENBERRY:  It hasn't been scheduled yet.

12         THE COURT:  If T-Mobile, as I understood your answer

13   earlier, uses other devices in addition to Google Maps to

14   transmit its traffic information to its mobile phones or

15   mobile -- mobile devices, how do I know that the claim

16   construction issues that they'll raise will be the same as

17   could be raised in this case?

18         MR. QUISENBERRY:  Well, the same claims are going to

19   be in issue.

20         I mean, if we --

21         THE COURT:  Constructions might not be sought after?

22   In other words, T-Mobile might be looking for a construction

23   totally different than Google might be looking for.

24         MR. QUISENBERRY:  Well, that's part of the problem

25   that the -- that we want to avoid is the risk that if you've

1   got Google up here seeking one construction of a term, and

2   T-Mobile down in Texas seeking another construction of a term,

3   and Judge Ward, in Texas coming up with one construction,

4   duplicating effort, wasting all of that time, and your Honor or

5   another judge here construing the same term and coming up with

6   an inconsistent ruling, that's contrary to the interests of

7   justice.  That's what the case law says.

8          That's a good reason to transfer the case to Texas, to

9   avoid the potential for inconsistent rulings.  So -- so we have

10  these identical issues.

11         I think the -- the -- the cases -- the cases don't

12  even hone in so finely as your question on specific claim

13  construction issues.  They talk in terms of there's sufficient

14  overlap in the technology, and -- and that sort of thing.

15         The -- the -- the -- then we get to the question of

16  what is the impact of the existence of the related cases in the

17  transferee forum.  And what the cases talk about is it's a,

18  quote, powerful reason to grant transfer.  It strongly weighs

19  in favor of transfer.

20         And I would submit to the Court that not transferring

21  this case would be directly contrary to the underlying policy

22  of 1404(a).

23         And I would just like to read this quote from the

24  Supreme Court's Continental Grain case.  We've set it forth in

25  our briefing.  But it says, quote, To permit a situation where

1   two cases involving precisely the same issues are

2   simultaneously pending in different district courts leads to

3   wastefulness of time, energy, and money that Section 1404(a)

4   was designed to prevent, close quote.

5          Now, if this case is not transferred, that is exactly

6   what we're going to have.  We're going to have a situation

7   where there are two cases involving precisely the same issues,

8   simultaneously pending in two different district courts -- here

9   and there -- and that is going to lead to the wastefulness of

10  time, energy, and money that 1404(a) was designed to prevent.

11         We think that this is so compelling, so powerful.

12  And -- and this principle --

13         THE COURT:  Is it compelling enough that Google would

14  be precluded for arguing for its own claim construction if this

15  case was transferred?  Different from that of T-Mobile?

16         In essence it sounds like one of the arguments you're

17  making is, Judge, you've got to let -- you've got to let our

18  T-Mobile judge in the Eastern District of Texas make the claim

19  constructions for all of the claims in this case.  And then

20  that will be what governs everything for all time with respect

21  to this patent.

22         That isn't necessarily true, is it?

23         MR. QUISENBERRY:  Your Honor, I'm sorry that I'm not

24  following your question.

25         THE COURT:  Well, it sounds like you're arguing that

1    we need, for the sake of judicial economy here, and efficiency,

2    to have one judge construe the claims in these patents that are

3    at issue one time, and that's it.

4         And what I'm asking is, is there any way that Google,

5    if the case does get transferred, is going to be precluded from

6    making its own arguments for claim construction separate and

7    distinct from those that T-Mobile makes?  There's no guarantee,

8    if this case gets transferred, it's going to get consolidated

9    with the T-Mobile case, is it?

10        MR. QUISENBERRY:  Well, it will be heard by the same

11   judge, Judge Ward.

12        THE COURT:  So he hears case number one, and he makes

13   certain claim construction rulings, based on the arguments the

14   parties make to him.  Correct?  And that case makes its way up

15   to the Federal Circuit.  Is he going to then impose his rulings

16   in that case on the other cases?

17        MR. QUISENBERRY:  I think that he will, more than

18   likely.  That's been my experience.  It's been my experience

19   that he will listen.

20        If you get a claim construction from Judge Ward and

21   then you want to come back later and you've got a good argument

22   for a change to what he's done, he'll listen.

23        THE COURT:  If you're a different party or if you're

24   the same party, which one are you talking about?

25        Are you talking about T-Mobile asking to reconsider a

1    claim construction ruling they may have gotten?  Or are you

2    talking about Google asking for an opportunity to make

3    arguments that were never made?

4         MR. QUISENBERRY:  I don't think they're going to be

5    precluded from making arguments that were never made.

6         THE COURT:  Okay.  Then why does it matter which judge

7    they make them to?

8         MR. QUISENBERRY:  Well, because you're going to have

9    two judges doing the same work.

10        It's inefficient and a waste of judicial resources to

11   have two judges study the same patents, study the same file

12   histories --

13        THE COURT:  I agree that's a factor that's got to be

14   considered.  I don't know that it is an all-determining factor.

15        MR. QUISENBERRY:  Well, can I continue on here to my

16   next point?

17        THE COURT:  Absolutely.  Absolutely.

18        MR. QUISENBERRY:  Because where I was leading to was

19   what -- that this principle that was set down in the Supreme

20   Court's Continental Grain case was recently affirmed by the

21   Federal Circuit in the Volkswagen case.  This was in May of

22   this year.

23        And what the -- the -- the quote here from that case

24   is that the existence of multiple lawsuits involving the same

25   issues is a paramount consideration when determining whether a

1   transfer is in the interest of justice, close quote.   Paramount

2   consideration.

3          And I was actually thinking about that word,

4   "paramount," this morning.

5          I got online and looked at a dictionary definition,

6   and it said, "overriding."   That's pretty strong.   Overriding

7   consideration.

8          So I think that the message that the -- the appellate

9   court, here, is sending is that this is a very, very strong

10  factor that when you have multiple cases, that -- that it's

11  overriding.   It's paramount.

12         And so I think that -- that in this case that there is

13  a -- an overriding consideration here that compels that this

14  case be transferred to Texas so that one court can do all of

15  the things that will have to be done, as opposed to having two

16  courts simultaneously do the same work.

17         I think that of all of the cases that I've looked at,

18  that the facts of the Volkswagen case are most similar to this

19  one.   And I would just kind of like to walk through some of

20  that.

21         In the Volkswagen case, the patent owner was, like

22  Traffic, a small Texas company, and it was operating from

23  outside of Texas.   In that case, the -- the patent owner was

24  operating out of Michigan.

25         So the patent owner there filed two lawsuits in the

1  Eastern District of Texas against 30 defendants.  And then one

2  of those defendants turned around and filed a declaratory

3  judgment action up in Michigan, where the plaintiff was.

4       And -- and so the -- the case that was filed in

5  Michigan -- the declaratory judgment action -- it was

6  transferred back to the Eastern District of Texas to avoid

7  wasting resources and inconsistent rulings.  We say this case

8  should be transferred to Texas for the same reason.

9       Now, then what happened was Volkswagen petitioned for

10  a writ of cert -- a writ of mandamus, pardon me, to the Federal

11  Circuit.  That was denied.  And then what Volkswagen decided to

12  do was, okay, I will try to transfer the Texas case to

13  Michigan.  That was denied, for the same judicial economy

14  reasons.

15       And Volkswagen took that to the Federal Circuit and

16  sought a writ of mandamus, ordering the Texas court to vacate

17  its order and transfer the case up to Michigan.  And that's

18  where we get this quote that I just read about the multiple

19  lawsuits being a paramount consideration.  It's an overriding

20  consideration.

21       So I just want to look at this from a couple of

22  perspectives; what things will look like if you deny transfer,

23  and what it will look like if you -- if you grant transfer.

24       So if transfer is denied, you're going to have two

25  cases addressing the same issues.

1          Two courts are going to have to learn the patents,

2    learn the same technology, construe the same patent claims,

3    address identical issues of -- of infringement and validity.

4    This will result in the useless waste of judicial time and

5    energy.  It will lead to the potential for inconsistent

6    rulings, and it's just contrary to just judicial economy.  It's

7    going to place an undue burden on the federal court system.

8          On the other hand, if the case is transferred,

9    judicial resources will be conserved.  One judge, Judge Ward,

10   will provide uniform claim constructions, consistent rulings,

11   and he will be able to uniformly apply the applicable law.

12         And we think that this is so compelling it's one of

13   those cases where even if you have the other 1404(a) factors

14   arguably pointing in the other direction, the

15   interests-of-justice prong is going to be determinative.

16   That's -- that's our view.

17         We believe that the -- that the other factors do not

18   point to keeping the case here.  But the point I'm making here

19   is that even if they did, this argument is so compelling, the

20   judicial economy argument is overriding, and it compels that

21   the case be transferred to Texas.

22         So I'm just going to spend a little bit of time here,

23   now, and talk a little bit about some of the other issues, the

24   other factors in the 1404(a) analysis.  And then I'll be done,

25   and turn it over to Mr. Shunk.

1          THE COURT:  Okay.

2          MR. QUISENBERRY:  So on the convenience of parties and

3     witnesses, as I've already said, Traffic is a Texas company.

4     It's conducted all of its business activities in Texas.  And it

5     would be more convenient for Traffic to continue all of its

6     enforcement in one court.  It would be, frankly, a burden on

7     Traffic to have to simultaneously litigate two cases in two

8     different courts on the same issues that would be involved

9     here.

10          Now, Google, they'll no doubt have witnesses in

11     California.  But those witnesses are going to have to travel;

12     whether this case stays here or whether it stays in Texas.

13     Because Google's home base is not here, it's in California.

14          I think another interesting point here that's not in

15     our papers, that occurred to me as I was preparing for this, is

16     that -- that the Google witnesses, they're going to have to go

17     to Texas anyway to testify in the T-Mobile action.

18          So it would be, to me, inconvenient as well for

19     Google's witnesses to have the case up here in Oregon, and also

20     have to testify in the case down in Texas.

21          THE COURT:  Is that an acknowledgment on your part

22     that the Google technology and Google device is going to be at

23     issue in the T-Mobile case?

24          MR. QUISENBERRY:  No.

25          THE COURT:  Then why are they going to have to go

1    there and testify?

2          MR. QUISENBERRY:  I mean, here's the story.  They're

3    saying that the -- you know, they've alleged what -- what --

4    what they have alleged here, that -- that -- that the -- that

5    T-Mobile and -- has advised it that the Google Maps is going to

6    be in the case.  And --

7          THE COURT:  How are they going to get there?  Are you

8    going to add them?  Is your client going to add them to the

9    T-Mobile case?

10         MR. QUISENBERRY:  Are we going to add who?

11         THE COURT:  Google?

12         MR. QUISENBERRY:  I have no idea.

13         THE COURT:  Is T-Mobile going to add them in the case?

14         MR. QUISENBERRY:  I don't know.

15         THE COURT:  Are they going to intervene in the case?

16    I mean, how are they going to get there?  If this case -- if

17    this case proceeds up here, why is Google going to end up as

18    witnesses in the T-Mobile case?

19         MR. QUISENBERRY:  Well, I guess it depends on whether

20    or not Google's products are going to be involved in the

21    T-Mobile case.

22         But according to Google's complaint here, they are.

23    So I don't see how Google can say that our -- our products are

24    involved for -- on one hand, but they're not on the other.

25         THE COURT:  I think I'm hearing that same kind of

1    problem with the argument that you're making.

2          MR. QUISENBERRY:  Well --

3          THE COURT:  They're -- on your Motion to Dismiss,

4    you're saying, Google's not involved in the T-Mobile case.

5    Google doesn't have anything that we've threatened against

6    them.  So why do they even have a basis to sue us?

7          MR. QUISENBERRY:  Well, on the Motion to Dismiss, the

8    focus is all on the confidentiality of the e-mail, and that --

9    that it's improper to base the -- the subject matter

10   jurisdiction on an improperly shared e-mail that was marked as

11   confidential.  I see that as something separate.

12         THE COURT:  Okay.  In any event, the -- the -- the

13   strength of the judicial economy argument here, even if these

14   issues here did point in favor of keeping the case, would

15   override those issues.

16         Let me move on to Google's choice of forum.

17         So what the cases say is that deference to the

18   plaintiff's choice of forum is substantially reduced when the

19   forum is not the plaintiff's residence or the forum lacks

20   significant connection to the activities alleged in the

21   complaint.

22         On the first point, the forum is not the plaintiff's

23   residence.  That's the case we have here.  Google's home turf

24   is in California, not in Oregon.

25         On the second point, the activities alleged in the

1    complaint are focused on the alleged threats that were made in

2    the T-Mobile -- two T-Mobile -- in the T-Mobile lawsuit in

3    Texas.

4              So the forum with the most -- with the significant

5    connection to the allegations in Google's complaint is the

6    Eastern District of Texas, not this court.

7              And so, you know, for those two reasons, we believe

8    the plaintiff's choice of forum should be entitled to very

9    minimal, if any, weight.

10             On the -- the parties' contacts with the forum, we

11   believe that that favors transfer.  Google has no contacts with

12   this forum.  They're headquartered in California.  Traffic is a

13   Texas company.  And -- and Traffic's contacts have been focused

14   in the Eastern District of Texas, with its enforcement

15   activities.  It's true that two of the inventors are in

16   Portland, but they're not parties.  And the relevant contacts

17   are with the parties.

18             And -- and for the parties, we've just said Google has

19   none and Traffic's contacts related to this action -- i.e.,

20   those related to T-Mobile -- have all been in connection with

21   the -- T-Mobile case pending in the Eastern District of Texas.

22             On the comparative litigation costs, I think it's

23   pretty clear that Traffic's costs are going to increase if this

24   case is not transferred, as it's going to have to be handling

25   parallel litigation on the same issues in two different courts.

1          On the issue of court congestion, the statistics that
2    we've cited show the trials are going faster in the Eastern
3    District of Texas:  18 and 1/2 months versus 23 months.

4          Google has indicated that -- or suggested that there's
5    a rule here in the District of Oregon that time to file -- from
6    filing to trial for a patent case, here, is one year.

7          I mean, it's my understanding that there's not a rule
8    to that effect.  We -- you know --

9          THE COURT:  I think the reality is that judges in just
10   about every district, in cases -- particularly complicated
11   cases like patent cases, as much as they want to get the cases
12   resolved sooner rather than later, there's a recognition that,
13   A, you're dealing with complicated issues; B, you're dealing
14   with lawyers who have more than one case.

15         And inevitably, when you go to set a schedule, you
16   deal with the amount of work that needs to be done in the case,
17   and you set a schedule that's going to let the lawyers get the
18   work done so they can fairly represent their clients; whether
19   the case is in Oregon or whether the case is in the Eastern
20   District of Texas.

21         And I don't think that it makes much sense to cite
22   overall general statistics for how long it takes a civil case
23   to get to trial in either district.  We don't think it's very
24   realistic to think that the patent case is necessarily going to
25   go that way.

1          Likewise, I guess I'm reminded of something my father

2     used to say about statistics and -- figures lie and liars

3     figure.  You can make just about anything you want out of

4     statistics.

5          And if you look at the number of pending cases per

6     judge, you've got to understand that pending cases per judge is

7     calculated based on district -- active district judges, not on

8     the number of judges actually trying cases in the district.

9          If you look at the Eastern District of Texas, what you

10    see is they've got eight -- as best I can tell -- district

11    judges that are active.  And they've got no -- they have no

12    senior judges, that I can find reference to easily at least,

13    and they have seven magistrate judges.

14          Now, I know, from some decisions that I've read and

15    coming from the Eastern District of Texas, that they don't look

16    kindly on magistrate judges trying civil cases, and they don't

17    look very kindly on magistrate judges making dispositive

18    decisions in civil cases; particularly if they don't have full

19    consent at the outset.

20          Compare that with this district, where we have six --

21    or four currently active district judges; six senior judges who

22    are hearing cases; six magistrate judges, all of whom are

23    trying civil cases, that are -- that are active; and two recall

24    magistrate judges who are -- one of whom is hearing cases.

25          There's more judges here trying civil cases than there

1    are in the Eastern District of Texas.  And so that the -- to me

2    the number of pending cases per judge is one of those

3    statistics that doesn't take us anywhere.  And the -- likewise,

4    what's more important to me is what's the case schedule in

5    the -- in the Google -- excuse me, in the T-Mobile case in

6    Texas.  And it sounds like there isn't one, as best I can tell.

7             MR. QUISENBERRY:  It has not been entered.  That's

8    correct.

9             THE COURT:  Okay.  And we've got a schedule here.

10   Quite frankly, that's not much of an argument for Google,

11   either.  Because that -- every case gets a case schedule here

12   when it's filed.  We -- you have -- the parties have proposed,

13   if the case stays here, a schedule.  Which, at some point, if

14   the case stays here, we'll talk about.

15            But we don't have -- the reality is we don't have, as

16   a practical matter, a schedule in either jurisdiction at this

17   point.  And what -- when I think, as a practical matter -- in

18   either jurisdiction -- the judge who manages the case is going

19   to have to sit down with the lawyers and look at what's --

20   what's the work to be done in the case and what's the

21   reasonable amount of time to get it done.  And you'll get

22   pressed by the judge in both cases to keep that time reasonable

23   and as short as reasonably possible.

24            You know, I think Judge Ward will probably do his job

25   not much differently than any judge in this district would in

1   that regard.  So I don't think statistics advance the ball very

2   far, particularly where neither case has a realistic schedule

3   in place at this point in time.

4           MR. QUISENBERRY:  I think that's fair.  I mean, I

5   think it's probably a wash.  I think there -- there's -- there

6   is --

7           THE COURT:  I think that's what I would call it, is a

8   wash.  I don't think our district is favored over the Eastern

9   District, or vice versa, on that particular prong.

10          Go ahead.

11          MR. QUISENBERRY:  I do think that there is an

12  important point, though, to be made that supports transfer on

13  this court congestion issue, and that is this.  If the case is

14  transferred, then that's going to result in lowering the

15  overall court congestion.  Because instead of having two cases

16  on the same issues, you're going to have one.  Whereas --

17          THE COURT:  Doesn't that assume that this case gets

18  consolidated with the T-Mobile case?

19          MR. QUISENBERRY:  I don't think so.

20          THE COURT:  You're going to have this case either in

21  Texas or here, and you're still going to have the T-Mobile case

22  in Texas.  So it looks like two cases, either way we go.  It's

23  just a matter of where.

24          MR. QUISENBERRY:  Well, I think it feeds into the

25  judicial economy argument.

1          THE COURT:  I agree that that argument is there.  I

2     mean, you --

3          MR. QUISENBERRY:  Okay.  Let me move on to compulsory

4     process.  I think this is probably also another one that's a

5     wash.  I don't think that either case is any better situated on

6     this particular issue.

7          As to the Oregon witnesses that were identified, those

8     witnesses have submitted declarations that their -- they will

9     voluntarily go to the Eastern District of Texas to -- to

10    testify.  So the subpoena power is a moot point there.

11         And I think the other point here is that Google has

12    not identified any witness who refuses to appear in the Eastern

13    District of Texas.  And as for its own witnesses, those are

14    presumed willing to appear in either location.

15         On the ease of access to proof, we believe that favors

16    transfer also.  Traffic's documents are in Texas.  Google's are

17    in California, not in Oregon.  I think that the other proof is

18    going to be dispersed throughout the country.  And -- and the

19    central location of the Eastern District of Texas will favor

20    ease of access to proof.

21         I think that's all that I have for now.

22         THE COURT:  Okay.

23         MR. QUISENBERRY:  Thank you.

24         THE COURT:  Thank you.

25         For Google.

1           MR. SHUNK:  May it please the Court, I would like to

2    follow this same order of issues as Mr. Quisenberry.  But I

3    would like to begin, your Honor, with a little bit of

4    introduction to what we're talking about in this case.  In

5    particular because I think it's important to understand what

6    exactly the product is, and that will lead you to see that this

7    product is used on many more phones and carriers than just

8    T-Mobile.

9           At the -- at the heart of the argument by Traffic that

10   the interests of justice require transfer of this matter to

11   Texas is a false assumption.  And that false assumption, your

12   Honor, is that the T-Mobile case in Texas has the same parties

13   as this case, has the same scope of issues as this case, and

14   will have the same kinds of claim construction.  None of those

15   things are true.

16          The -- your Honor quite rightly asked the question

17   about whether or not there will be a useful claim construction

18   in the T-Mobile case that can simply be carbon copied into the

19   Google case.

20          And I -- I think that that's very unlikely, because

21   T-Mobile is just one carrier.  The Google product is able to be

22   used on many different carriers, many different phones.  It

23   comes in different varieties.  And the arguments that we would

24   make with regard to that product are likely to be different

25   from what T-Mobile might make.

1          But to get back to --

2          THE COURT:  When you say "that product," you're

3     referring to the Traffic product?

4          MR. SHUNK:  Yes, yes.  Um-hmm.

5          To get back to what I started with, though, your

6     Honor, if the Court would indulge me, I have about a

7     three-minute video that is -- is and was available publicly,

8     that describes how Google Maps for mobile works.  And that's

9     the product that's at issue in this case.  And it briefly

10    touches on the traffic feature.

11         With your Honor's approval, I would play that video

12    right now, so that you can just see the product that we're

13    talking about.

14         THE COURT:  That's fine.  But I want to take about a

15    five-minute recess, and then come back and play your video.

16         MR. SHUNK:  Sure.  Thank you very much, your Honor.

17         THE CLERK:  Court in recess.

18         (Recess taken.)

19         THE COURT:  Please be seated.

20         MR. SHUNK:  And so with your Honor's approval, I'll

21    play my video.

22         THE COURT:  Go ahead.

23         (The following video recording was reported.)

24         VIDEO SPEAKER:  Hello, my name is Michael Salisky

25    (phonetic), and I'm a product manager for Google Maps for

1    mobile -- hello, my name is Michael Salisky.

2              (Video stopped.)

3              MR. SHUNK:  Let's try it this way.

4              (Video resumed.)

5              VIDEO SPEAKER:  Hello, my name is Michael Salisky, and

6    I'm a product manager for Google Maps for mobile.  Google Maps

7    for mobile is a free download that lets you view maps in

8    (indiscernible) imagery, search for local businesses, and get

9    driving directions; all from your mobile phone.

10             Google Maps for mobile teaches a technology we call My

11   Location.  When you use Google Maps on your phone, you don't

12   have to enter your current location.  Just press a button, and

13   the phone will automatically determine where you are, even if

14   you don't have GPS.

15             The map on your phone looks and feels just like Google

16   Maps does on a desktop computer.  Scroll in any direction to

17   see more of the map.  Switch to satellite view to see pictures

18   of a region.  Zoom in to see the region in more detail.

19             You can search for nearby businesses.  Search for

20   "pizza," to see nearby pizza shops.  You can quickly dial a

21   business or request driving directions to your destination.

22   When you notice heavy traffic on the map, consider an alternate

23   route.

24             Google Maps for mobile is available on most Java,

25   Symbian, and Windows mobile phones.  Like one from Blackberry,

1   Nokia, and Motorola.

2          To get started with Google Maps on your phone, just

3   visit m.google.com/maps on your phone's browser.  Or in the

4   U.S., text maps to 33669.

5          (Video concluded.)

6          MR. SHUNK:  Your Honor, there are several points made

7   in that video that are particularly relevant to what we're

8   talking about here today.

9          First of all, you saw briefly, at the end of the

10  video, a -- a map in which some of the interstate highway had

11  been colored red.  That is the traffic feature that this case

12  will be about.  And it is the providing of that information

13  onto the phone that's at the heart of the dispute between the

14  parties.

15         The other important thing to carry away from that

16  video, your Honor, is the fact that Google Maps for mobile is

17  usable with many different carriers, operating systems, and

18  phones -- phone hardware.  For example, it is available on

19  certain T-Mobile phones, preloaded with the phone.  That would

20  be on the T-Mobile system.  But it is also available, for

21  example, on the i-phone, under the AT&T system as well.  It is

22  downloadable onto many other phones.  It's downloadable onto a

23  Blackberry.  It's downloadable onto just about any -- what they

24  call -- Smartphone that uses a Java platform.

25         And so Google Maps for mobile is a very widespread

1    product and involves -- and the consequences of it involve much

2    more than simply the use on the T-Mobile phone.

3    Now, your Honor, let me turn, first, to the issue of

4    subject matter jurisdiction in this case, and then I'll talk

5    about transfer.

6    THE COURT:  Let me ask you this.  If -- if -- if

7    you're going to litigate the issue of whether or not Google

8    Maps for mobile infringes the Traffic patents, or whether those

9    patents are valid patents, it -- it really doesn't matter

10   whether you do that in the context of a T-Mobile lawsuit or an

11   AT&T lawsuit or any other lawsuit, does it?  It's still your

12   client's technology versus their technology?

13   MR. SHUNK:  It is, but the technology works

14   differently depending on the carrier and depending on the

15   particular phone that is used.

16   THE COURT:  But isn't there a core of Google Maps

17   that's going to be potentially infringing, or not?

18   MR. SHUNK:  I don't think so, your Honor.  And let me

19   give you an example of why.

20   Google Maps uses many different routes to try to find

21   out the location of the holder of the cell phone.  That's the

22   My Location feature.

23   If -- if there is a GPS -- a global positioning

24   satellite system in the phone and if Google Maps is given

25   access to that through the phone's operating system, it can use

1  GPS.  It can also use strength of cell tower broadcasts.  It

2  can use Wi-Fi, if there is Wi-Fi broadcast; and, again, if the

3  cell phone is able to receive that.

4       The different cell phone operating systems and the

5  different cell phone carriers provide different mixes of those

6  different methodologies for finding location.  And so it is not

7  necessarily the case that Google Maps will always work the same

8  way for each phone.  There are just a lot of different versions

9  of Google Maps.  And so the issues are broader than might only

10 be raised in a T-Mobile or might only be raised in an AT&T

11 lawsuit.

12      As to subject matter jurisdiction, your Honor, your

13 Honor has before him our well-pled complaint and the motion of

14 the defendant.

15      Our complaint very clearly sets out a direct threat of

16 infringement.  We say, in our complaint, that Traffic made the

17 statement to one of our customers that the use of Google Maps

18 for mobile with the traffic feature on their phones was an

19 infringement of their patents.  We pled that specifically in

20 our complaint.

21      In response, there has been certain declarations

22 provided that talk about an e-mail.  The e-mail has not been

23 provided to the Court.  There have been claims that there was

24 a -- that there was an anticipation of confidentiality on the

25 part of Traffic, but we have no verification, factually, that

1   there was an agreement to confidentiality on the part of

2   T-Mobile.

3         As the facts stand before this Court, what this Court

4   knows is that clearly there is an admission that there was --

5   there was an e-mail from Traffic to our customer, T-Mobile,

6   that alleged that our product infringed their patents.  And

7   that is the kind of direct infringement that should give rise

8   to subject matter jurisdiction in a case like this.

9         Traffic says that even though that that's true -- and

10  they don't dispute it in any of their papers -- that

11  nevertheless it shouldn't count because it was unfair, they

12  say, for us to use something that was provided in confidence to

13  T-Mobile in order to give ourselves a basis for a declaratory

14  judgment action.  That's wrong on two counts, factually and

15  legally.

16        Factually, there simply never was a confidentiality

17  agreement between Traffic and T-Mobile, at least as far as

18  papers that have been supplied to this Court show.  And

19  Mr. Quisenberry admitted, in his remarks to the Court, that in

20  fact there is no such written agreement.

21        That means that rather than doing what SanDisk says

22  should be done -- and that is reaching an agreement of

23  confidentiality in advance of sharing information to which both

24  parties agree and then providing the information, here we have

25  an instance where the information was simply provided with a

1   tag that said, oh, by the way, this is confidential; and

2   Traffic assumed that it would be held confidential by T-Mobile.

3   There's a big difference.

4       And I ask your Honor to consider this.  If what

5   Traffic is saying is correct, it would mean that there's a

6   whole new strategy for writing cease-and-desist letters in the

7   patent field these days.

8       Whenever I want to write a cease-and-desist letter to

9   someone who's infringing my client's patent, all I have to do

10   is slap "this is confidential" at the bottom of the first page,

11   send off the cease-and-desist letter to them.  And even if in

12   the cease-and-desist letter I say, Here are the patents.  This

13   is your product that infringes.  Here's a claim chart showing

14   how you infringe.  And if you don't pay us money now, we're

15   going to sue you.  Nevertheless, they couldn't bring a

16   declaratory judgment action against us because we placed

17   "confidential" on the bottom of the first page.

18       That can't be the answer.

19       Your Honor, the Declaratory Judgment Act was created

20   in part for situations just like this.  And we quoted in our

21   brief -- I -- I -- I like the quote enough that I would like to

22   read a little bit of it for your Honor.  It's from the

23   Arrowhead case.  And -- and the court there says, This appeal

24   presents a type of a sad and saddening scenario that led to

25   enactment of the Declaratory Judgment Act.

1          In the patent version of that scenario, a patent

2          owner engages in a danse macabre, brandishing a

3          Damoclean threat with a sheathed sword.

4          Guerrilla-like, the patent owner attempts

5          extra-judicial patent enforcement with

6          scare-the-customer-and-run tactics that infect the

7          competitive environment of the business community

8          with uncertainty and insecurity.

9          That's before the Act.

10         And that's exactly what was being done here.  A

11    scare-the-customer statement was made to our customer,

12    T-Mobile, but not directly to us, in an effort to keep us from

13    being -- from having the ability to defend our own product.

14         But Arrowhead says -- it goes on to say:

15         Before the Act, competitors victimized by that

16         tactic were rendered helpless and immobile so long

17         as the patent owner refused to grasp the nettle and

18         sue.  After the Act, those competitors were no

19         longer restricted to an in terrorem choice between

20         the occurence of a growing potential liability for

21         patent infringement and abandonment of their

22         enterprise; they could clear the air by suing for a

23         judgment that would settle the conflict of

24         interests.

25         So what's really going on here, your Honor?  What's

1    going on is that Traffic wants to control the order and the

2    venue of how they're going to go after all of the targets that

3    they believe they are rightfully entitled to pursue with regard

4    to their patent.

5           They want to control when the allegations arise, in

6    which court they arise, and they want to keep Google in the

7    position that it has to watch its product being defamed to its

8    various customers piecemeal.  And those customers being sued

9    piecemeal; while Google itself can't step in and represent its

10   own product and clear its own product's name.  That simply

11   isn't what the Declaratory Judgment Act was -- that -- that

12   simply is what the Declaratory Judgment Act was created to

13   remedy.

14          I -- I don't read SanDisk as supporting Traffic's

15   position in the least.  SanDisk, if you read all of the facts,

16   was very similar to what went on here.

17          There was a protracted period of discussion between

18   the two parties.  At every turn, the patent owner kept trying

19   to cloak its communications in allegations about Rule 408

20   confidentiality.  There was some effort, I believe at one

21   point, to deem some of the discussions confidential.

22          The Court ultimately said no, you can't do that.  You

23   can't use these techniques in order to make allegations and yet

24   prohibit the -- the accused from bringing a declaratory

25   judgment action.

1          Now, Mr. Quisenberry made reference to a phrase that

2    appears a number of times in his brief.  And that phrase is

3    "fairly traceable to the defendant's acts."  It comes from the

4    Prasco case that's cited by the defendant in its briefs.

5          What Traffic is trying to do is take that phrase,

6    "fairly traceable to the defendant's acts," and try to import

7    some sort of extra ethical obligation on -- onto a declaratory

8    judgment plaintiff by looking at the phrase fair -- "fairly

9    traceable," in order to say, not only does it have to be

10   traceable, but it ought to -- it ought to satisfy some basic

11   ethical level of fairness in order to be something that would

12   be the basis for a declaratory judgment action.

13         In fact Prasco doesn't say that at all.  When Prasco

14   quotes -- or sets out the "fairly traceable" language as part

15   of the test that it will apply to determine subject matter

16   jurisdiction, it cites to some other cases.  If you go to those

17   other cases, those cases leave the word "fairly" out.  They

18   just talk about traceable to the defendant.

19         So the word "fairly" was -- I don't want to say

20   anything was thrown in haphazardly by the court.  But certainly

21   "fairly" -- the word "fairly" has no entrenched jurisprudence

22   as part of the test for subject matter jurisdiction.

23         Even more important is to turn to the actual facts of

24   Prasco.  What happened in the Prasco case is that the defendant

25   in a -- in a declaratory judgment action wasn't even aware of

1    the plaintiff's product until it was served with a declaratory

2    judgment action.

3            What had happened is that there had been unrelated

4    litigation between the two parties on a different patent and a

5    different product several years prior.

6            The declaratory judgment plaintiff saw a new product

7    from the defendant, looked at the patents that were marked on

8    that product, got copies, read them, thought that one of or two

9    of them might pose a problem for its own products, and on that

10   basis alone filed the declaratory judgment action.

11           And the court rightly held that it was improper for

12   there to be subject matter jurisdiction found in that case,

13   because there was no act of the defendant that led to a threat

14   of harm to the declaratory judgment plaintiff.

15           But that's not what we have here, your Honor, of

16   course.  What we have here is an admitted statement to our own

17   customer, throwing into question our product on -- on a basis

18   of an allegation of patent infringement.  It is clearly

19   traceable to -- to the defendant in this case, and not at all

20   like the Prasco factual situation.

21           We think that there is subject matter -- matter

22   jurisdiction.  It appears that the Rule 408 argument that

23   seemed to be advanced by the defendant in its initial brief has

24   now been dropped.  So it comes down to this question of whether

25   or not there can be a -- a confidential agreement when there is

1    no meeting of the minds.  And, of course, your Honor, it's --

2    it's something we all learned in first year of law school, that

3    there can be no agreement without a meeting of the minds.  Here

4    there is no evidence to suggest that there was ever a meeting

5    of the minds between Traffic and T-Mobile with regard to

6    confidentiality of what was said to T-Mobile.  And so on the

7    facts before you, there is subject matter jurisdiction.

8         With regard to transfer, your Honor, I find myself

9    puzzled that I'm even standing here arguing about transfer.

10        Normally a defendant raises the issue of transfer when

11   it's been sued in a district that has nothing to do with it,

12   and feels as though it is -- it -- it needs to regain the home

13   court advantage, so to speak.

14        In this case we have a defendant, Traffic, that may be

15   registered as a Texas corporation, but on that registration

16   lists as its only business address an address in Portland,

17   Oregon.

18        Two of the three inventors of the patents at issue

19   reside in Portland, Oregon.  The -- it would appear as though

20   the documents relating to this case -- they're said to be

21   located in Bellaire, Texas.  It's not -- there isn't a lot of

22   information provided about that by the defendant.  But I -- I

23   can draw one conclusion from that, and that is the reason it's

24   in Bellaire is because that's near where their counsel is

25   located, and all documents relating to this litigation were

44

1    shipped from Portland down to Bellaire, in Texas.

2         Because I can't see any other possibility but that the

3    inventors' own notes with regard to their invention were done

4    in Portland, where they reside, and that the information with

5    regard to prosecution of the patent -- which was prosecuted by

6    a Portland law firm -- would have initially been in Portland.

7         So it appears, your Honor, that there aren't any facts

8    in this case supporting jurisdiction in Texas that haven't been

9    created by Traffic in order to create that jurisdiction.

10        There are no witnesses that are located in Texas, but

11   Traffic solves that problem by providing waivers from its two

12   inventors, or -- and now we see what the -- the second brief

13   from all three inventors, that they will agree to come to Texas

14   to testify.

15        Traffic is really located in Portland, but to

16   manufacture jurisdiction down there, they register as a Texas

17   corporation.

18        Even the other cases that are said to be related to

19   the one that we're here about today were filed by them in Texas

20   intentionally to bolster the Eastern District of Texas as an

21   appropriate jurisdiction for this case.

22        But your Honor I think rightfully asks the question,

23   How many of those cases were filed prior to the time that our

24   case was filed?  How many after?

25        And indeed, your Honor, there aren't six but there are

1   seven cases that have been filed down in the Eastern District

2   of Texas.  One of them appears to have been filed perhaps in

3   error, and then there was a refiling.  But there are seven

4   actual numbers that appear.  Of those seven, four were filed

5   after this was filed.  And of the three that were filed before,

6   two of them apparently have been settled.

7          So even when you look at the question of the pendency

8   of the cases down there, most of that is an after-the-fact

9   creation of facts that relate to jurisdiction.

10         So looking at the traditional factors that your Honor

11  would consider in a motion like this, they all seem to point to

12  Portland as the place for this matter to be.

13         I -- I don't presume to understand -- you know, to

14  guess what the strategy is on -- on behalf of Traffic.  But it

15  would appear as though Traffic has made a decision for

16  litigation purposes that it would prefer to litigate down

17  there.  But that goes to the heart of all these factors.

18         Convenience to litigation counsel is not, under any of

19  the cases that have been cited by the parties, one of the

20  things to be factored into the question of where the case

21  should be pending.  And yet all of the things that we've talked

22  about in this case really go to convenience to litigation

23  counsel of being down in Texas and not really to the

24  convenience of the inventors or the company that's represented.

25  So I would say that those factors that they lay out really

1    don't support their request for transfer.

2         And that, perhaps, is why Traffic instead insists

3    that, putting all of those factors aside, it's the interests of

4    justice that really ought to be considered by this Court.  And

5    so let me take a few minutes to talk about the interests of

6    justice.

7         The interest-of-justice argument basically boils down

8    to this, from Traffic.  Wouldn't it be better to have one judge

9    decide all of these matters, rather than having two judges

10   decide it?

11        Notice that there is no case in Texas that this case

12   could be consolidated with because of identity of the parties.

13   Even if this case were sent down to Texas and a decision was

14   made to consolidate, for example, with the T-Mobile case, there

15   would still be different allegations as between those two

16   cases.  Because, as we showed you earlier, Google Maps for

17   mobile encompasses many cell phone carriers other than

18   T-Mobile.

19        More importantly, your Honor, the plaintiff certainly

20   was in control -- I say the plaintiff -- the plaintiff in the

21   Texas cases, Traffic, was certainly in control of how they

22   brought their cases in Texas.

23        They didn't bring one omnibus case for the interests

24   of economy and judicial efficiency, which they might have, in

25   which all 48 defendants that are named down there would have

1    been put into a single action and one judge -- for example,

2    Judge Ward could determine all things in one hearing.  They

3    chose, instead, to file six or seven different actions down

4    there.  There has been no effort to consolidate any of them, to

5    date.

6         There must have been a reason for that, and the reason

7    must have been that there are differences among the different

8    groups of defendants, down there.

9         Judge Ward, if he ends up deciding each of these

10   cases, or the ones that haven't been settled, will have to make

11   a different set of claim construction, infringement, and

12   validity analyses with regard to each one of these cases.

13        As your Honor points out, really, the question isn't

14   judicial efficiency.  It's whether your Honor, for example,

15   decides this case here; or this case gets shipped down to Judge

16   Ward, to be another case for Judge Ward to decide down there.

17        But, certainly, it's not the case that one ruling on

18   claim construction is either going to act as res judicata or

19   per -- and -- and it's doubtful that one ruling on claim

20   construction will even be sufficient to cover all of the issues

21   that relate to the cases that -- that are not being decided in

22   that particular Markman context.

23        So, really, the interests of justice boil down to,

24   then, simply the question of whether it makes sense for one

25   judge to, as -- as Mr. Quisenberry points -- puts it, learn the

1  technology in the case, as opposed to having two judges learn

2  the technology.

3          Well, your Honor, I would suggest to you that lawsuits

4  where judges learn the technology of the patent on several

5  different occasions happen all the time.

6          I might have a patent, and I sue Company ABC.  There's

7  a claim construction.  There's a finding of infringement,

8  patent validity.  Then it turns out several years later that

9  there's another defendant, XYZ, and my client sues them as

10  well.

11          There is clearly no res judicata or issue estoppel as

12  between those two cases, and a second judge has to consider

13  those same issues.  That -- that is what would happen in this

14  case.  And, your Honor, we believe that the appropriate court

15  to decide the issues in this case is this Court.

16          Mr. Quisenberry wants to minimize the plaintiff's

17  choice-of-forum rule, but there's really no basis to minimize

18  it.  We are an appropriate plaintiff.  This is the first filed

19  case between these parties.  Our choice of forum, which was not

20  random or adventicious, but based on the fact that the

21  defendant that we sued resides in this district, the inventors

22  reside in this district, and this district also happens to be

23  close to where our witnesses and documents reside, was an

24  appropriate choice for -- for a forum for this case.

25          And we believe that our choice ought to be given

 1    weight, great weight in this matter.  Because to do otherwise

 2    would be, instead, to give weight to Traffic's litigation

 3    strategy for pursuing its -- its defendants.

 4         And, your Honor, I don't mean to suggest that Traffic

 5    is acting inappropriately in suggesting whatever litigation

 6    strategy they have.  I simply say litigation strategy as a

 7    neutral term to describe what -- however they may choose to

 8    bring their actions.

 9         But, nevertheless, their -- their decision to proceed

10    in the Eastern District, filing six or seven different cases

11    down there, and to do it in that fashion, is simply a

12    litigation strategy.

13         Our litigation strategy is to ask this Court to decide

14    these issues.  There is clearly subject matter jurisdiction.

15    There are clearly significant contacts with this forum.  This

16    matter shouldn't be transferred.  It should stay here, and the

17    issues should be decided by this Court.

18         With regard to the question of the speed of decision,

19    it's true that there hasn't been a -- a case management

20    schedule set by this Court, and there hasn't been one set, yet,

21    down in Texas.  And speculation about how quickly one or the

22    other might come to trial probably is nothing more than just

23    speculation.

24         However, I can tell your Honor that we do intend to

25    proceed as quickly as this Court will allow in this case.  We

1    want to pursue this case to judgment.  Something that doesn't

2    appear in the pleadings, but that the defendant is aware of, is

3    that we have filed an ex parte request for re-examination of

4    these patents already with the Patent and Trademark Office.

5         However, it is not our intention, your Honor, to --

6    if -- if those requests for ex parte re-examination are

7    granted, it is not our intention to seek a stay in this case,

8    because we want to pursue this case, in this court, to a

9    judgment; so that we can lift the cloud that hangs over this

10   very important product to Google.  So that we can continue

11   to --

12        THE COURT:  Such as your request for -- such a request

13   for stay wouldn't be -- wouldn't enjoy particular --

14   particularly a warm welcome by this judge.

15        I've gone on record more than once saying that such a

16   re-examination isn't binding in any -- in any event; and

17   proceed with it in the patent office, and we'll proceed with

18   our case here.

19        MR. SHUNK:  Right.  Well, I agree with your Honor.

20   We're pursuing that because we believe that we're entitled to a

21   re-examination of the patent.  But it is not a strategy on our

22   part, by any means, to -- to attempt to stretch out this case.

23   We want this case to proceed quickly.

24        Your Honor, we have, on both sides, very detailed

25   briefs.  I don't have anything to add to them, unless your

1    Honor had additional questions.

2         THE COURT:  Well, when you listen -- when you listen

3    to the arguments raised by Traffic and you read them in their

4    briefs, you're left with the question for Google as to -- I

5    think they would frame it something along the lines of why

6    should the plaintiff be able to choose a jurisdiction that is

7    most convenient for them, or more convenient for them and one

8    that is less convenient for us?  We -- we do our business down

9    in Texas.  And I -- I think I know your response to that, but

10   that's how they seem to frame the argument.

11        How do you respond?

12        MR. SHUNK:  Well, that is how they framed their

13   argument, but there are several responses to that.

14        Number one, the answer is because we're the plaintiff,

15   and the plaintiff files the lawsuit.  And our choice of venue

16   for filing this lawsuit was not based on a whim but has very

17   clear connections to this district.

18        Secondly, it's difficult for me to understand how

19   this -- how the pendency of -- of the matter in -- in the city

20   where the defendant is located, in the city where the inventors

21   are located, how could that be less convenient for -- for the

22   defendant as a party?

23        The only person it's less convenient for, your Honor,

24   is litigation counsel, who is located in Texas.  And I

25   understand that it may be less convenient for him to fly up

1    here than to have this pending in Texas.  But the problem is

2    that the cases are very clear that convenience of the -- of the

3    forum to counsel, on either side, is -- that is not one of the

4    factors.  When you're considering the convenience of the locale

5    to the parties, it is the convenience to the party, not to

6    their lawyer.

7              THE COURT:  Okay.  Thank you.

8              MR. SHUNK:  Thank you, your Honor.

9              THE COURT:  Any reply?

10             MR. QUISENBERRY:  Yes.  Thank you.

11             Let me just address this convenience to counsel.

12             That's an argument that's coming out of left field.

13   We didn't make it.  And I agree that the case law is

14   unequivocal that convenience to counsel is irrelevant.  We

15   don't contend that it is, he doesn't either; we agree.

16             There was some discussion earlier about the relevance

17   of infringing products to claim construction earlier in our

18   discussion.  The point that I neglected to make earlier is that

19   it's improper for the Court to consider the infringing products

20   when construing the claims.

21             Claim construction is to be made based upon the

22   intrinsic record, which includes the patents and the file

23   history and any other extrinsic evidence that the Court

24   permits.

25             THE COURT:  Clearly that's true, and the purpose of my

53

1   question earlier was, isn't it likely that people with

2   different potentially-accused devices might be looking at

3   construing claims differently of your device; your client's

4   case?

5          MR. QUISENBERRY:  I don't know how -- I mean, I think

6   it is certainly possible.  It wouldn't surprise me.

7          But, again, our point is that if -- you don't want to

8   have two judges getting two different claim construction

9   arguments in two different courts and coming up with a

10  different inconsistent claim construction.  The best place for

11  competing claim constructions to be made is to the same court.

12  That way you don't run the risk of inconsistent claim

13  constructions.

14         On the motion to dismiss -- so Mr. Shunk made the

15  point about the well-pleaded complaint, and there's an

16  allegation in there that -- that we have threatened them with

17  patent infringement.

18         But -- but the key is -- is that what we've done is

19  we've come in and added evidence to the record, pointing out

20  that the allegation was based upon a confidential e-mail, and

21  we believe that that's improper.

22         He points out that the e-mail has not been produced to

23  the Court.  And I guess my response to that is on the issue of

24  subject matter jurisdiction, Google is the party with the

25  burden of proof, not Traffic.  And so if Google thought that it

1    was important for the Court to see the confidential e-mail,

2    they could have given it to you under seal.

3           They also make a point that -- basically that we don't

4    know what T-Mobile thought about confidentiality.  And I don't

5    think that that's relevant.  I mean, we're not saying that

6    there was an express agreement of confidentiality that T-Mobile

7    expressly agreed to.  Our theory is an implied contract.

8    Whenever you go under the implied contract theory, you never

9    have agreement from the other side, otherwise there wouldn't be

10   a dispute.  And so whatever T-Mobile was thinking about

11   confidentiality is irrelevant.

12          He also --

13          THE COURT:  Wouldn't that lead to the ability of your

14   client to label anything they feel like labeling confidential,

15   confidential, and shielding that from the world?

16          MR. QUISENBERRY:  Well, I think the response to that

17   and to Mr. Shunk's point about sending out cease-and-desist

18   letters -- I think there's a big difference between sending out

19   a cease-and-desist letter and having confidential settlement

20   communications in the context of a pending litigation.  I think

21   there is a difference there.

22          We're not arguing for some rule that would support the

23   outcome that Mr. Shunk suggested.

24          THE COURT:  That sounds like we're getting to close to

25   arguing 408, again.

1          MR. QUISENBERRY:  We're not.  I mean --

2          THE COURT:  Well, you mentioned confidential

3    settlement communications.  It made me think --

4          MR. QUISENBERRY:  Well, again, let me be clear.  We

5    never -- Mr. Shunk suggested that this -- the -- the Federal

6    Rule of Evidence 408 argument seemed to have been dropped, that

7    we've come here and changed our tune.  That's not true.

8    There's nothing in our briefing that would -- where we argued

9    and relied on Federal Rule of Evidence 408.  We made it clear

10   in our --

11         THE COURT:  So all I need to focus on in your

12   description of the e-mail is that it was a confidential

13   communication; not that it was a confidential settlement

14   communication.  Correct?

15         MR. QUISENBERRY:  Yes.

16         THE COURT:  All right.

17         MR. QUISENBERRY:  Yes.

18         They -- Mr. Shunk also made the point that -- that

19   we've basically agreed that there was a charge of infringement.

20   That's not so.  We haven't answered the complaint.  We filed a

21   motion to dismiss it, and we've provided evidence in response

22   to that that said that the -- that the -- that the source of

23   their apprehension of suit is a confidential e-mail.  And we've

24   done that without saying -- taking a position one way or the

25   other on whether or not the -- what the other details of that

1 e-mail are.

2   Now -- and so -- so I think that you can't just say

3 that we've -- we've agreed that there was a charge of

4 infringement, because we haven't.

5   Mr. Shunk also quoted the Arrowhead case.  It's a

6 well-known case that you see in the declaratory judgment cases

7 about the purpose of the Declaratory Judgment Act, and the --

8 the sword and the threat, and all of that.  But -- but the part

9 that I kind of keyed in on is the guerrilla,

10 scare-the-customer-and-run tactic.  That's not what's going on

11 here.  We did not go to T-Mobile and then scare them, and then

12 run away.  That's not what happened.  We filed a lawsuit

13 against them.

14   So those cases talked about, in the old days, before

15 the Declaratory Judgment Act, what a patent owner could do is

16 they could run around to all of the customers of a particular

17 competitor, and they would say, We're going to sue you for

18 patent infringement unless you come do business with us.

19   And there was nothing before the Declaratory Judgment

20 Act that the competitor, the manufacturer of the -- that it was

21 supplying product to the customer, could do.  There was nothing

22 they could do until a Declaratory Judgment Act was put into

23 place.

24   That's not what -- what our facts are here.  We have

25 gone -- and, actually, we filed a lawsuit, and it was only

1    after we filed the lawsuit that we had the communication.

2          There was some discussion about fairly traceable and

3    distinguishing the facts of the Prasco case.  I mean, we're not

4    arguing that the facts of the Prasco case are on point with the

5    facts of this case.

6          It was merely a statement that -- of one way to

7    approach the determination whether there's a case or

8    controversy.

9          THE COURT:  Is it your interpretation that the fairly

10   traceable -- that the word -- the use of the word "fairly," in

11   that context refers to the ethics or morality of the

12   traceability?  Or is it to the reasonableness of the

13   traceability?

14         MR. QUISENBERRY:  Well, I think that -- to try to

15   answer your question, what we're saying is that -- we're

16   talking about a fundamental standard of fairness.

17         Does that answer your question?

18         THE COURT:  No.

19         You can be fair because you're ethical and aboveboard,

20   or you can be fair -- it can be fairly traceable because most

21   of us would agree that this is reasonably traceable.  I'm not

22   talking about the facts of our case.  I'm just talking about

23   the term, "traceable."

24         MR. QUISENBERRY:  No, I don't think we're taking a

25   position that "fairly" means it's reasonably traceable.

```
 1          THE COURT:  You think it means ethically or morally
 2   traceable?
 3          MR. QUISENBERRY:  I mean, I don't know that I would
 4   use those words.
 5          THE COURT:  What words would you use?  I'll stop
 6   putting them in your mouth.
 7          MR. QUISENBERRY:  Well, I guess the words -- I mean,
 8   the ones that I've already used.  I'm not sure I'm coming up
 9   with anything different.  You know, just the fundamental
10   standard of fairness.
11          And on the point about this word "fairly" --
12          THE COURT:  The reason you feel it's not fairly
13   traceable is because it was supposed to be confidential?
14          MR. QUISENBERRY:  Yes, sir.
15          THE COURT:  Okay.  And beyond that, there is no
16   argument that you have about it not being fairly traceable?
17          MR. QUISENBERRY:  Well, I mean -- I mean, I guess
18   there are a couple of ways to look at traceability here.  I
19   mean, it's directly traceable to T-Mobile.  If T-Mobile would
20   not have disclosed the confidential e-mail, we wouldn't be
21   here.  We wouldn't have to be dealing with this.  And so -- I
22   mean, I guess that may be more of a causation approach to
23   traceability.  But, you know, the direct result -- this -- this
24   lawsuit is the direct result of T-Mobile's disclosure of the
25   e-mail, not Traffic's disclosure of it.
```

1        And what I was going to get to there is that I think
2   the point was that this word "fairly" somehow kind of -- just
3   kind of got grafted into the -- the -- the quote, "fairly
4   traceable."
5        I don't know the answer to that.  I just wanted to at
6   least make that point.  That I seem to recall, when I was doing
7   the research on this, that I thought that this was a phrase
8   that was appearing in other places and not just in this case.
9   But I -- I'll have to look into that particular issue further.
10       On the SanDisk case, I believe I heard Mr. Shunk say
11  that there was some statement in the SanDisk case about an -- a
12  confidentiality, on the facts of the case.  That there was
13  some -- that -- that the patent owner was contending
14  confidentiality.  If that's in there, I missed it.
15       The other point is that Mr. Shunk was saying that the
16  facts of SanDisk are really similar to the facts of this case.
17  And, therefore, he doesn't understand why this case is even
18  being sought to be transferred.  And I think there's a key
19  difference between the facts.  And it's kind of similar to the
20  one I made earlier.  And that is that there, there were
21  pre-litigation.  There was not a lawsuit pending in the SanDisk
22  case.  It was just letters going back and forth.  Here, in our
23  case, we have a litigation that is underway.  I think that's
24  the significant difference.
25       But let me move on to the transfer points.

1          I believe I heard Mr. Shunk say that normally you

2   don't have a motion to transfer when you're getting sued on

3   home court.  That's paraphrasing.  But -- and I -- I disagree

4   with that.  I think that the Volkswagen case is an excellent

5   example of it.

6          There was a case where there was a DJ that was filed

7   up in Michigan, and it was transferred to Texas on the judicial

8   economy argument.

9          I've also heard this trying to impugn Traffic because

10  we manufactured the connection to Texas by filing lawsuits down

11  there.  And we cited the case that says that there's nothing

12  improper about a Texas company suing in a Texas court.  So I

13  think that the effort to impugn Traffic is misplaced.

14         THE COURT:  What do I have in the record -- or what --

15  I guess, maybe put another way, what -- what are you able to

16  tell me about how a -- how Traffic, with a Portland address,

17  with inventors from Portland for the device, how did they end

18  up in Texas?  And why?

19         MR. QUISENBERRY:  Well, I would have to go back --

20         THE COURT:  Should I concern myself with that?

21         MR. QUISENBERRY:  I don't think that it's -- that it's

22  relevant.

23         THE COURT:  Okay.  Is there anything in the record

24  about it?  I don't think there is.

25         MR. QUISENBERRY:  I don't think there is, your Honor.

1          THE COURT:  Okay.  There was also this discussion

2     about whether there's been a total of six or seven cases.

3          Technically, Mr. Shunk is correct.  There have been

4     seven cases.  There was a clerical mishap when the last case

5     was filed.  Evidently there was failure to designate the

6     Marshall division.  Therefore, since no division was

7     designated, it automatically got assigned to Beaumont.  As soon

8     as we figured that out, it was kind of a -- just a procedural

9     process of getting it moved over.  But evidently, it looks like

10    there were actually two case numbers that were assigned.

11         But -- but we also see, again, this attempt, I think,

12    to divert attention away from the T-Mobile case by talking

13    about the other cases that were filed after the T-Mobile case.

14         I mean, the other cases are -- are not -- they're not

15    critical to rule in Traffic's favor on the Motion to Transfer.

16         I think if you just look at the T-Mobile case and the

17    fact that it was filed before the Google case -- so they can't

18    make that argument that it was done after they filed this case.

19    And the fact that you've got multiple other defendants, other

20    carriers in that case -- AT&T, and Sprint, and Verizon, in

21    addition to T-Mobile.  I think there's one other company that's

22    in that case.

23         You know, those -- even though those cases -- those

24    other -- the cases as to those other defendants are not as

25    direct -- directly related as the T-Mobile case is to the

1    Google case, they're still generally related.

2         And the cases talk about when there's an overlap of

3    that nature, that that's certainly an appropriate instance to

4    recognize the -- the interests of justice in favor of the

5    transfer.

6         There was some discussion about consolidation, and

7    that none of the cases down there have been consolidated.  I

8    think that if this Court transfers this case down to Texas, I

9    think this is a case that would be appropriate for

10   consolidation with the T-Mobile case, and that's probably what

11   we would ask the court to do.

12        On the choice of forum, I mean, I would just go back

13   to what the cases say about whenever you've got a situation

14   where a company doesn't sue -- they're not suing in their home

15   court and it's not -- the activities aren't substantially

16   related, that the deference to the plaintiff's choice of forum

17   is substantially reduced.  And I think we've clearly got that

18   situation here.  The real activities alleged in the complaint

19   all center around T-Mobile and the Texas T-Mobile lawsuit.  And

20   that's the place where the most significant connection to the

21   activities alleged in this complaint are.

22        I guess, just in closing, I would just like to

23   reiterate that, you know, on the -- on the transfer motion, we

24   believe that the -- that the judicial economy argument is very,

25   very strong and compels that the case be transferred to Texas.

1              Do you have any other questions of me?

2              THE COURT:  One.  You made it clear in your argument

3    here in your reply that Traffic does not admit that it's made a

4    charge of infringement against Google.

5              That leaves two other possibilities; that they deny

6    that they made a charge of infringement, or that they just

7    haven't responded to the allegation that they've made a charge

8    of infringement.  Which of the other two places is Traffic?

9              MR. QUISENBERRY:  Well, I'm not sure it's a choice

10   between those two.  The answer is we have no requirement to

11   respond until we're required to respond.

12             THE COURT:  Okay.

13             MR. QUISENBERRY:  And, you know, I don't think that

14   it's necessary for us to respond based upon our theory of why

15   the case should be dismissed.

16             THE COURT:  I interpret that as you haven't responded

17   to whether there was a charge of infringement or not.  And

18   that's where -- that's where I thought you were, and I -- I

19   understand your position that you don't think you need to

20   respond to that at this point in time, and that's okay.

21             MR. QUISENBERRY:  Okay.

22             THE COURT:  All right.

23             MR. QUISENBERRY:  All right.  Thank you.

24             THE COURT:  Thank you.  I'll take the motions under

25   advisement.  I will try to get you a ruling as soon as I can.

1          I -- I don't plan to take up the scheduling issues

2     today, because I think -- I think we've first got to figure out

3     whether the case is here or not here before we deal with that,

4     at least in this court.

5          I think that's all I'll say about scheduling at this

6     point.

7          What I -- what I plan to do is I have not asked

8     whether there is -- the clerk's office whether there's full

9     consent in this case or not.  I assume there is not, at this

10    point in time.  And so I will issue these rulings as findings

11    and recommendations with an opportunity to object for both

12    sides, and a response to the objections.

13         What I plan to do is if the case looks like at least

14    if my decision were to be adopted by a district judge that it's

15    going to stay here, I'll get you back in front of me to talk

16    about scheduling promptly.

17         If it doesn't -- in other words, before a district

18    judge reviews the decision, because in any event -- at least if

19    I've decided that there is a case and that it's going to be

20    here, there's going to be some litigation somewhere, it looks

21    like, between these parties.  And so it makes sense to me that

22    you get going sooner rather than later.

23         So that's why I'll get you in for scheduling before

24    any district judge review of whatever my decision is, if I --

25    if I've decided that the case ought to stay here.  If I've

1    decided it shouldn't stay here, then I won't get you in for

2    scheduling before the district judge reviews my decision.

3           If you have issues that you're working on between

4    yourselves in the litigation while you're waiting and you need

5    some assistance in resolving disputes, I'll try -- I'll try to

6    provide that assistance to you.

7           You may not -- Traffic may not want my assistance,

8    because you think it's better for Judge Ward to be the one to

9    make that decision.  I'll leave that to you.

10          But if -- if the parties think there's something

11   meaningful I can do to help you keep the issues moving forward,

12   let me know, and I'll do what I can to assist you.

13          Thank you.

14          MR. SHUNK:  Thank you, your Honor.

15          MR. QUISENBERRY:  Thank you.

16          THE CLERK:  Court is in recess.

17          (Conclusion of proceedings.)

18

19                         -0-

20

21

22

23

24

25

1

2                                        --oOo--

3

4    I certify, by signing below, that the foregoing is a correct

5    transcript of the oral proceedings had in the above-entitled

6    matter this 22nd day of March, 2010.  A transcript without an

7    original signature or conformed signature is not certified.

8

              /S/ Amanda M. LeGore
9              _____

10             AMANDA M. LeGORE, RDR, CRR, FCRR, CE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25